UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                   Hon. Sean F. Cox

  -vs-                           No. 16-CR-20394

D-1 JAMES ROBERT LIANG,      Sentencing Date: August 25, 2017

       Defendant.

_____/

**SENTENCING MEMORANDUM OF THE UNITED STATES
AS TO DEFENDANT JAMES ROBERT LIANG**

The United States submits this memorandum regarding the sentencing of defendant James Robert Liang on August 25, 2017.

**INTRODUCTION**

James Robert Liang, an engineer working for global automotive giant Volkswagen AG (VW), participated in a widespread fraudulent scheme to sell illegal, environmentally-deficient vehicles in the United States by misleading regulators and consumers into believing VW's "clean diesel" engines complied with U.S. emissions laws meant to protect human health and the environment. He pleaded guilty to one count of conspiracy, in violation of 18 U.S.C. § 371, and

1

agreed to cooperate in the government's investigation and prosecution of his co-conspirators. Liang's cooperation included extensive debriefings with the government in which he provided an insider's perspective of a company that had lost its ethical moorings in pursuit of increased market share and corporate profits. After considering a downward departure for his cooperation in providing information and evidence about the wrongdoing of others, a sentence of three years imprisonment is sufficient but not greater than necessary to hold Liang accountable for his role in this remarkable corporate crime.

## ARGUMENT

As the Court is aware, 18 U.S.C. §3553(a) requires the Court to impose a sentence which is sufficient but not greater than necessary to comply with the purposes set forth in that section. In this memorandum, the government summarizes the statutory factors most applicable to Liang's case.

**A. The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))**

From 1983 to 2008, Liang worked as an engineer in VW's diesel development department in Wolfsburg, Germany. In 2006, while helping develop a new diesel engine for the U.S. market, Liang and his colleagues realized they could not build an engine that would meet customer demand for performance and fuel economy while at the same time complying with new U.S. limits for

2

tailpipe emissions of nitrogen oxide (NOx), a hazardous byproduct of diesel fuel combustion. To solve this dilemma, Liang and his colleagues installed, calibrated, and refined a software switch function (the "defeat device") that would fully engage the engine's pollution controls only when the car was undergoing U.S. emissions tests in a laboratory. Aside from this narrow context, the defeat device made the engine's pollution controls operate at a dramatically reduced rate, causing the vehicles to emit NOx into the environment at over thirty times the legal limit. As an expert in diesel engines, Liang was instrumental in calibrating the vehicles so they would operate as described above in both the "test mode" and the "road mode."

In March 2007, Liang accompanied VW compliance officials to meetings with the U.S. Environmental Protection Agency (EPA) and the California Air Resources Board (CARB) in an attempt to persuade the regulators that VW's new diesel vehicles would meet the new U.S. emissions requirements in order for VW to get the certifications needed to sell its new diesel vehicles in the United States. During these meetings, Liang's colleagues falsely claimed that VW's new engines would comply with regulatory limits for NOx gases, omitting the important fact that VW intended to install defeat devices in the vehicles in order to circumvent U.S. emissions tests.

After VW fraudulently obtained regulatory approval for the engines, Liang moved to the United States in 2008 to help launch VW's new diesel vehicles. As "Leader of Diesel Competence" for VW Group of America, a VW subsidiary, Liang helped handle certification, testing, and warranty issues for U.S. customers. Over the next seven years, he understood that his colleagues continued to fraudulently certify that VW's diesel vehicles met U.S. emissions standards and falsely marketed the vehicles to the public as environmentally-friendly "clean diesel" vehicles.

The new engines were neither eco-friendly, however, nor particularly robust, as configured. Over time, U.S. VW diesel customers submitted more and more warranty claims for faulty parts and components related to the vehicles' emissions control systems. Liang and other VW engineers surmised that the problems arose because the vehicles were not shifting into "road mode" (i.e., intentionally evading tailpipe limits) while on the road but, instead, accidentally remained in "test mode" (i.e., meeting tailpipe limits)—something the engines could not sustain. Liang and his colleagues were tasked with correcting this situation so the vehicles would recognize better when they were outside of testing conditions and thus improving the defeat device.

In 2014—not long after VW aired a Super Bowl advertisement showing its engineers sprouting angel wings every time a VW car reached 100,000 miles—Liang and his fellow engineers used their ingenuity to enhance the defeat device so VW's fraudulent vehicles could better recognize when they drove on U.S. roadways, allowing them to pollute at higher rates. Under the pretext that the vehicles needed a software update to improve performance and avoid warranty issues, Liang and his colleagues instead improved the defeat device to reduce the stress on the emissions control systems caused by the failure of the defeat device to work properly.

In the spring of 2014, a third-party environmental group published the results of a study of diesel vehicles, which showed huge discrepancies between VW's NOx emissions on the road and in testing labs. CARB and EPA began to ask VW increasingly pointed questions about these emissions results. Instead of telling CARB and EPA the truth, Liang and his colleagues strategized a way to respond without revealing the existence of the defeat device.

Thereafter, VW employed an 18-month strategy of denial, evasion, and subterfuge, hoping to wear down the regulators with a barrage of meaningless technical details, until VW could change the subject with a new line of vehicles that could actually comply with U.S. emissions laws. As late as August 2015, Liang

participated in a meeting at CARB at which VW continued to muddy the waters, until one of Liang's colleagues deviated from a script approved by VW management and disclosed VW's different treatment of emissions depending on whether the car was being tested or driven on the road.

In September 2016, a year after VW was compelled to acknowledge its hoax, Liang pleaded guilty to one count of conspiracy, in violation of 18 U.S.C. §371, for conspiring with other VW employees to defraud the United States, commit wire fraud by defrauding U.S. customers, and violate the Clean Air Act.

B. **Seriousness of Liang's Crimes, Just Punishment and Respect for the Law (18 U.S.C. § 3553(a)(2)(A))**

Liang was not the mastermind behind this astonishing fraud, which the media would later call "Dieselgate."  He did not sit in the executive suites at VW where the defeat device was discussed, nor did he direct or supervise others in the company who took part in the criminal scheme. But as one of VW's most valuable diesel engine experts and the "Leader of Diesel Competence" in the United States, Liang took part in many of the pivotal events of this long-running corporate fraud, including: (a) the development of the deficient engine and defeat device in 2006; (b) the meetings with EPA and CARB in 2007 to get approvals to bring the vehicles into the United States; (c) the calibrations and refinements of

6

the defeat device in 2008; (d) the handling of customer warranty complaints when the engines malfunctioned in 2010-14; and (e) the efforts to hide VW's use of the device from regulators in 2015.

Throughout this nine-year period, Liang knew that what he was doing was wrong but minimized his own moral responsibility for the fraud by reassuring himself that he was merely an engineer whose job it was to present practical solutions to problems, regardless of their propriety. He told himself that others in the company were responsible for deciding whether ethical considerations should influence which course to take. If they opted for the more dubious path, Liang would help implement it without protesting, blowing the whistle, or walking away from the job.

Liang has now come to terms with his wrongdoing. There remains a need, however, for the Court to impose a sentence sufficient to punish him for his role in this stunning corporate fraud and to hold him accountable for his crimes. A three-year sentence accomplishes this objective.

C. **Deterring the Criminal Conduct of Others** (18 U.S.C. § 3553(a)(2)(B))

As Dieselgate spread within VW, Liang was not alone in his constrained sense of moral duty. Distressingly few within the company exercised independent reflection or judgment about the ethics of their decisions or those of their

colleagues. This abdication was symptomatic of a troubling corporate culture where engineering performance, market dominance, and profits took precedence over business integrity.

Companies are not autonomous machines, of course. They are made up of people who make decisions affecting consumers, shareholders, and the public. The criminal and civil fines and settlements imposed on VW, along with the oversight of a corporate compliance monitor, hopefully will reorient VW's business priorities and serve as a message to other companies that might be inclined to cut similar ethical corners. But unless individual actors are also punished, future corporate employees and contractors may be tempted to justify their criminal behavior as just "doing their jobs" or "following orders." Sentencing Liang to a three-year term of imprisonment will deter others from making similar rationalizations.

D. **Liang's History and Characteristics** **(18 U.S.C. § 3553(a)(1))**

Liang had no criminal record before pleading guilty to the crime above. Since being contacted by law enforcement, he has accepted responsibility for his role in the fraud. He is a mild-mannered, soft-spoken man who worked his entire 34-year career at VW.

Liang is a German national, as are his wife and children. Since arriving in the United States in 2008, they have made a life for themselves here. All that will end with Liang's judgment of conviction. His nonimmigrant visa has been revoked and he cannot apply for reentry into this country. He has agreed to a judicial order of removal from this country following any term of imprisonment.

**E. Protecting the Public from Further Crimes (18 U.S.C. § 3553(a)(2)(C))**

Since being charged, Liang has shown an appreciation for the gravity of his crime, underscored by his willingness to cooperate in the investigation and prosecution of others for similar wrongdoing. Before this prosecution, Liang had no criminal history and his misconduct arose within a corporate context that likely will not be repeated. There is little doubt that he will not commit new crimes, even if given the chance to do so.

**F. Sentences Contemplated by the Sentencing Guidelines (18 U.S.C. § 3553(a)(4)(A), (b)(1) & (c))**

The government concurs with the findings and calculations in the presentence investigation report. The probation office correctly assessed Liang's total offense level as 37, derived from a base offense level of 6, a 30-level increase for a loss amount of over $550 million, a 2-level increase for participating in an offense involving ten or more victims, a 2-level increase because a substantial part

of the scheme was committed outside of the United States and involved sophisticated means, and a 3-level decrease for acceptance of responsibility. Liang's sentencing guidelines range of imprisonment is sixty months, which is the statutory maximum for his offense.

**G. Motion for Downward Departure for Substantial Assistance**

The government moves the Court for a downward departure under U.S.S.G. § 5K1.1 and recommends that the Court reduce Liang's term of imprisonment to three years, a forty percent departure from his statutory maximum sentence.

Investigating and proving corporate crimes is challenging without insiders to narrate the often complex and clandestine schemes used to defraud regulators and consumers. As a longtime member of the conspiracy, Liang has given the government a firsthand perspective of the illicit objectives and motivations of VW and its employees. Liang began to cooperate immediately, when the investigation was in its early stages, and the information he provided formed an important basis for the next investigatory steps.

His truthful, accurate, and corroborated statements have provided important evidence of the guilt of his codefendants, including Oliver Schmidt who recently pleaded guilty for his part in the conspiracy. Before Schmidt pleaded

guilty, Liang stood ready to testify at Schmidt's trial. Liang's substantial assistance to the government should be credited in the Court's sentencing determination.

### H. Avoiding Sentencing Disparities Among Similarly Situated Defendants (18 U.S.C. § 3553(a)(6))

In considering an appropriate sentence for Liang, the Court must seek to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar crimes. The Court should look nationwide for such comparable defendants because subsection 3553(a)(6) "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson,* 591 F.3d 491, 505 (6th Cir. 2010). The Court's careful review of the guideline range "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Although it is difficult to compare Liang with his codefendants in this case---none of whom have been sentenced---the government's recommendation of three years imprisonment is reasonable and appropriate because it takes into account Liang's five-year guidelines range of imprisonment, as well as a standard reduction for the amount of cooperation he has provided.

11

### I. Providing Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7))

An order of restitution is not appropriate here. VW agreed to compensate purchasers of its fraudulent vehicles in a class action, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.). This Court cannot feasibly order restitution for the numerous victims who did not participate in that action. Determining the actual loss of each such victim for purposes of criminal restitution would be a highly individualized and complicated effort that would needlessly prolong Liang's sentencing to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process. Restitution therefore is not appropriate or necessary in this matter.

### J. Fine Amount

The government recommends that Liang pay a $20,000 fine, which is at the low end of the Guideline fine range. Liang appears to have sufficient assets to pay such a fine.

## **CONCLUSION**

Based on the foregoing, the government recommends that the Court grant the government's motion for a downward departure from the Sentencing Guidelines based on Liang's substantial assistance and sentence him to a term of three years imprisonment, along with a monetary fine of $20,000.

Respectfully submitted,

| | |
|---|---|
| DANIEL L. LEMISCH<br>Acting United States Attorney<br>Eastern District of Michigan | JEAN E. WILLIAMS<br>Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>Department of Justice |
| s/*Mark Chutkow*<br>Mark Chutkow<br>Chief, Criminal Division<br>John Neal<br>Chief, White Collar Crimes Unit | s/*Jennifer Leigh Blackwell*<br>Jennifer Leigh Blackwell<br>Senior Trial Attorney<br>Environmental Crimes Section |
| SANDRA MOSER<br>Acting Chief, Fraud Section<br>Criminal Division<br>Department of Justice | |
| s/*Benjamin D. Singer*<br>Benjamin D. Singer<br>Deputy Chief<br>Alison L. Anderson<br>Trial Attorney<br>Securities & Financial Fraud Unit | Date:  August 18, 2017 |

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2017, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

DANIEL NIXON
JENNIFER DERWIN
*Attorneys for James R. Liang*

                                            s/MARK CHUTKOW
                                            Assistant U. S. Attorney

Dated:  August 18, 2017